1
2
3
4
5
6                **UNITED STATES DISTRICT COURT**
7                **EASTERN DISTRICT OF CALIFORNIA**
8
9  **JOHN DOE, et al., on behalf of themselves )**      **CIV-F-05-1417 AWI SMS**
   **and all others similarly situated,          )**
10                                             **)**
                        **Plaintiffs,         )**      **ORDER RE: MOTION TO DISMISS**
11                                             **)**
                                               **)**
12        **v.                                 )**
                                               **)**
13 **D.M. CAMP & SONS, et al.,                 )**
                                               **)**
14                      **Defendants.         )**
   _____ **)**

15

16        This case is before the court on Defendants' motion to dismiss on a variety of bases and

17 to sever the case.  Plaintiffs oppose the motions and have made countermotions for limited

18 severance and for interim leave to proceed using pseudonyms.

19

20                              **I. History**

21        This case is one of several class action suits that have been brought by seasonal

22 agricultural workers against table grape growers based in Kern County.  Defendant growers are

23 D.M. Camp & Sons; Marko Zaninovich, Inc.; Sunview Vineyards of California, Inc.; Giumarra

24 Vineyards Corp.; El Rancho Farms; Stevco, Inc.; FAL Inc. dba Lucich Farms; Castlerock

25 Farming and Transport, Inc. (collectively "Defendants").  Plaintiffs are former and current

26 employees of Defendants who have brought suit using pseudonyms.

27        This suit was initiated on November 9, 2005.  The operative Corrected Second Amended

28 Class Action Complaint. ("Complaint") was filed on March 13, 2006. Doc. 65.  The Complaint

                                    1

contains several specific allegations against each Defendant; broadly, it alleges Defendants failed to properly pay wages by forcing employees to work off the clock, forcing employees to purchase tools out of pocket, failing to pay minimum required wages, failing to provide required meal and rest periods, failing to provide accurate itemized wage statements, and failing to maintain time records.  Plaintiffs' claims are divided into eleven causes of action: (1) violations of the federal Migrant and Seasonal Agricultural Workers Protection Act, 29 U.S.C. §1801 et seq. ("AWPA") through failure to disclose in writing the terms and conditions of employment, misinformation concerning the terms and conditions of employment, noncompliance with the terms of the working arrangement, and failure to pay wages when due; (2) failure to pay wages; (3) failure to pay reporting time wages; (4) failure to provide required meal and rest periods; (5) failure to pay timely wages at termination of employment; (6) failure to provide itemized employee wage statements; (7) recovery for these violations under the Private Attorney General Act, Cal. Labor Code §2699 et seq. ("PAGA"); (8) conversion of employees' labor; (9) breach of employment contract; (10) violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §17200 et seq. ("UCL") through the above described activities; and (11) failure to pay overtime wages against Defendant D.M. Camp only.  The last ten causes of action are "pursuant to California Labor Code §§ 201, 202, 203, 204, 205.5, 214, 216, 218, 218.6, 221, 226, 226.7, 512, 1174, 1194, 1194.2, 1197, and 1199, , 2802 [sic] and Business & Professions Code §§17200 et seq." Doc. 65, Complaint, at 22:21-24.  Federal jurisdiction is founded upon 28 U.S.C. §1331 (federal question AWPA claims) and 28 U.S.C. §1367 (supplemental jurisdiction for state claims).[1]

---

[1]The original complaint also alleged federal jurisdiction based on the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4. Doc. 2, at 2:5-8.  The new law provides for federal jurisdiction over class actions when the aggregate sum in controversy is over $5 million and there is diversity between at least one plaintiff and one defendant.  Congress also directed federal courts to decline jurisdiction when more than 2/3 of the plaintiffs are citizens of the forum state and to consider the interests of justice in deciding whether to exercise jurisdiction when more than 1/3 of the plaintiffs are members of the forum state. 28 U.S.C. § 1332(d)(2)-(4). In the operative Complaint, Plaintiffs no longer assert federal jurisdiction on this basis.

Defendants Stevco and FAL argue Plaintiffs also rely on 28 U.S.C. §2201 (declaratory judgment) as a basis for federal jurisdiction. Doc. 74, Stevco Brief, at 24:14-16.  In response,

The Doe Case is related to three other cases pending in district court: Catalina Robles, et. al. v. Sunview Vineyards of California, Inc., 06-0288; Santos Valenzuela, et. al. v. Giumarra Vineyards Corp., 05-1600; and Arnaldo Lara, et. al. v. Rogelio Casimiro, et. al., 06-0028. All involve similar claims against some subset of Defendants on a class action basis. The Doe and Lara Cases are brought by the same constellation of attorneys while the Robles and Valenzuela Cases are brought by a separate group of attorneys. Doe Plaintiffs have made a motion to consolidate the Doe, Valenzuela, and Lara Cases with the Doe/Lara Attorneys as class counsel. Doc. 23. Magistrate Judge Snyder denied the motion without prejudice. Doc. 57.

The Lara Case was initiated in Kern County Superior Court on March 5, 2004. Originally, the defendant in that case was Roger Casimiro dba Golden Grain Farm Labor. On September 21, 2004, an amended complaint was filed, adding El Rancho, Stevco, Lucich, and Castlerock as defendants.

In the Doe Case, the Defendants filed motions to dismiss in April 2006. Docs. 68, 74, 75, 77, 78, 81, and 83. These various motions also sought the severance of the case as to the various Defendants and the dismissal of the suit for failure to obtain leave to proceed as Doe plaintiffs. Plaintiffs made two countermotions: (1) for limited severance of the case for trial, while preserving it as one consolidated action and (2) for interim leave to proceed as Does. Docs. 89 and 94. Given the number of issues involved in the motions, the court sought additional briefing from all parties. Doc. 121. The additional briefing was filed in August and September 2006.

## II. Legal Standards

In considering a motion to dismiss under Rule 12(b)(6), the court must accept as true the allegations of the complaint in question. Hospital Bldg. Co. v. Rex Hospital Trustees, 425 U.S. 738, 740 (1976). The court will construe the pleading in the light most favorable to the party opposing the motion and resolve all doubts in the pleader's favor. Jenkins v. McKeithen, 395

---

Plaintiffs clarify that declaratory judgment is not an independent basis for federal jurisdiction. Doc. 97, Plaintiffs' Opposition, at 76:7-11.

1   U.S. 411, 421 (1969).  A motion to dismiss for failure to state a claim should not be granted

2   unless it appears beyond doubt that plaintiff can prove no set of facts in support of the claim that

3   would entitle him to relief. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984), citing

4   Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Palmer v. Roosevelt Lake Log Owners

5   Ass'n, 651 F.2d 1289, 1294 (9th Cir. 1981).  Absent unusual circumstances, dismissal without

6   leave to amend is improper unless it is clear that the complaint could not be saved by

7   amendment. Chang v. Chen, 80 F.3d 1293, 1296 (9th Cir. 1996).

8       When a defendant challenges the legal sufficiency of a complaint, the court's review is

9   limited to the complaint. Cervantes v. City of San Diego, 5 F.3d 1273, 1274 (9th Cir. 1993).  As

10  a general matter, a district court may not consider any material outside of the pleadings when

11  ruling on a Rule 12(b)(6) motion. Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001);

12  Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994).  Material properly submitted as part of the

13  complaint and materials the court may take judicial notice of may be considered. Lee v. City of

14  Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001).  If the parties present the court with any other

15  evidence and the court considers it, the court must converting the Rule 12(b)(6) motion into a

16  motion for summary judgment. Fed. R. Civ. Pro. 12(b)(6); Anderson v. Angelone, 86 F.3d 932,

17  934-35 (9th Cir. 1996).

18

19                              **III. Discussion**

20      The issues raised in this collection of motions are numerous, varied, and complex.

21  Though Defendants make the same legal arguments in general, there is some variation between

22  them.  Where appropriate, the court will consider all arguments made as applicable to all

23  Defendants.  The court denies Defendants motions to dismiss and grants the motion to sever,

24  requiring Plaintiffs to file new complaints in compliance with the substance of the Order.

25

26  **A. Doe Plaintiffs**

27      All Defendants seek to have the suit dismissed for improper naming of Doe Plaintiffs

28  without leave of court.  The Ninth Circuit allows plaintiffs to proceed as Does (pseudonymous

pleading) "when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity. We further hold that in cases where, as here, pseudonyms are used to shield the anonymous party from retaliation, the district court should determine the need for anonymity by evaluating the following factors: (1) the severity of the threatened harm, (2) the reasonableness of the anonymous party's fears, and (3) the anonymous party's vulnerability to such retaliation. The court must also determine the precise prejudice at each stage of the proceedings to the opposing party, and whether proceedings may be structured so as to mitigate that prejudice. Finally, the court must decide whether the public's interest in the case would be best served by requiring that the litigants reveal their identities." Doe v. Advanced Textile Corp., 214 F.3d 1058, 1068 (9th Cir. 2000).  One Central District court concluded that "this Circuit does not require prior application, although plaintiffs must nevertheless obtain leave to proceed under fictitious names." American-Arab Anti-Discrimination Comm. v. Ridge, SA CV 02-1200 AHS (ANx), 2003 U.S. Dist. LEXIS 25100, at *23 (C.D. Cal., Nov. 5, 2003).

Plaintiffs have not previously sought leave of court, but have made a countermotion for leave to proceed as Does until the first scheduling conference, which had been scheduled for September 12, 2006.  However, the conference has been postponed pending resolution of these related motions. Docs. 139 and 149.  In support of their request, Plaintiffs note that the Eastern District of California Local Rule 16-240 "clearly envisions that issues such as the propriety of proceeding as Does would be initially considered at the first case management conference. The Local Rule provides that the following types of issues should be dealt with at the status conference: '(10) modification of the standard pretrial procedures specified by these Rules because of the relative simplicity or complexity of the action; (13) appropriateness of special procedures...; (17) the appropriateness of any variance from the usual filing and service requirements applicable to the action, and (18) any other matters that may facilitate the just, speedy and inexpensive determination of the action.'" Doc. 95, Plaintiffs' Countermotion Memo, at 2:16-25.  The court's reading of the Local Rule does not come to the same conclusion.  While pseudonymous pleading may certainly be raised in the first status conference, the language does not suggest that it would be improper to raise the matter earlier.

Defendants seek dismissal of the suit for the failure to follow the proper procedures. While Plaintiffs should have sought leave to proceed as Does earlier, a firm decision on pseudonymous pleading is not an appropriate result at this time. Plaintiffs must be given a chance to make a formal motion on the matter and to offer substantive proof concerning the dangers of retaliation. If they wish to continue as Does, Plaintiffs must file (concurrently with their amended complaints) either a signed stipulation by the relevant Defendant(s) consenting to Doe status or a formal motion to be heard before the Magistrate Judge.

**B. Joinder/Severance**

Several Defendants seek to have the case severed, alleging that they were misjoined. "Misjoinder of parties is not ground for dismissal of an action....Any claim against a party may be severed and proceeded with separately." Fed. R. Civ. Proc. 21. Plaintiffs have made a countermotion, seeking to keep the suit unified, but severing each Defendant for purposes of discovery and trial.

Plaintiffs do not claim that Defendants are necessary parties under Fed. R. Civ. Proc. 19. Permissive joinder of defendants under Fed, R, Civ. Proc. 20(a) is appropriate when there is "asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising our of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." Defendants dispute that there is any common transaction, occurrence, or series of transactions or occurrences at the root of the claims. In supplemental briefing, Plaintiffs argue that joint and severability applies "based on the indivisible harm caused by all in establishing a common practice of unpaid and improperly paid labor in the California table grape industry." Doc. 127, Plaintiffs' Supplemental Brief, at 33:8-11. Plaintiffs present several interrelated theories but admits that at this stage, "the basis for joint and several liability can only be summarized, not be set out fully." Doc. 127, Plaintiffs' Supplemental Brief, at 34:3-5.

Plaintiffs propose to amend the Complaint to specify a new class for certification:

All persons who are or have been employed or jointly employed by any of the Defendants

in the State of California who, within four (4) years of the filing of the Complaint in this case, have worked as non-exempt hourly and/or piece-rate employees and were aggrieved by not being paid all lawful wages, not being indemnified for employee costs, not being paid all wages, not being indemnified for employee costs, not being provided accurate wage statements, or not being paid statutory penalties as a result of Defendants' actions which depressed the working conditions of the class.

Doc. 143, Plaintiffs' Supplemental Reply, at 31:9-13.  The new class would encompass all

Plaintiffs and seek recovery against each Defendant.  In support of the new class, Plaintiffs state:

> The claims of this lawsuit spring from a pattern of employer misconduct and wrongdoing that has characterized the labor system in much of the table grape industry, where unpaid and improperly paid labor, as alleged herein, are commonplace and regular practices. The Defendants herein include some of the largest growers of table grapes in California. The unlawful practices and policies alleged are widespread and entrenched in the industry. The practices of the industry are uniform, or nearly uniform among many of the major grape growers, at least in part due to grower organizations that spread improper employment practices.

Doc. 65, Complaint, at 16:6-12.

> Plaintiffs are persons 'aggrieved' by each Defendant's violations of AWPA including failing to pay wages due and violations of working arrangements. These violations have a direct economic impact on Plaintiffs because the violations interfere with Plaintiffs' ability to make the state minimum wages, to negotiate for higher wages, and otherwise depress wages and working conditions in the Southern Central Valley grape industry. Defendants have significant power to affect wages and working conditions throughout the labor market. In particular, grape growers in this area singularly have the ability to define wages in this labor market akin to oligopsony and it is their actions in violating labor laws that that have caused Plaintiffs' injury.

Doc. 143, Plaintiffs' Supplemental Reply, at 31:17-21.  Plaintiffs assert that such allegations are

sufficient to state a claim allowing each Plaintiff to sue each Defendant.


**1. Coordinated Industry Action**

Several of the Defendants have convincingly cited to Wynn v. National Broadcasting Co.,

Inc., 234 F. Supp. 2d 1067 (C.D. Cal. 2002) to demonstrate that alleging all employers in an

industry have a common behavior is not an adequate basis for joining them together in a suit

based on such behavior.  In Wynn, television writers sought to sue various parties involved in the

production and broadcasting of television programs for age discrimination:

> As understood from Plaintiffs' complaint, Defendants are 51 separate entities, each with distinct hiring and firing practices, and with a multitude of separate individuals in charge of determining these practices for each of the separate entities. Plaintiffs are 50 individuals, some of whom have worked for a few of the employers, some of whom have

7

barely worked for any of the employers, some of whom have applied to work for many of the employers, and some of whom have not applied to work for any of the employers. The mere assertion that because these employers and talent agencies are members of a common industry is not sufficient to satisfy the requirement that the right to relief against all Defendants arises out of the same transaction or occurrence.

Plaintiffs do not contend that every Defendant is involved in every other Defendant's hiring and firing decisions, yet they still contend that the employers should be joined because of an industry-wide pattern and practice of age discrimination in the hiring of television writers....However, nowhere in that [U.S. Supreme Court 'pattern or practice'] case does it suggest that a plaintiff or group of plaintiffs may proceed without being able to identify a collective or controlling entity (either formal or informal) from which this industry-wide discriminatory policy could originate. Even when construing all factual allegations in favor of Plaintiffs and assuming Plaintiffs can successfully allege a discriminatory 'pattern-or-practice' against each Defendant individually, there is still no rationale behind requiring all Defendants to defend each other collectively.

Wynn v. NBC, 234 F. Supp. 2d 1067, 1078-79 (C.D. Cal. 2002).  The court granted the motion to sever as there was no uniform policy maker responsible for the acts at the root of the complaint.  The "Plaintiffs submitted a diagram of boxes, circles, squares, and triangles connected by an inordinate and indecipherable configuration of 'squiggly' lines, attached to the heading, 'The Defendants are Inextricably Intertwined in the Hiring Process (simplified illustration),'" which left the court unimpressed as there was no "substantive allegations of any commonality among all of the decision/policy-makers in this diverse group of defendants." Wynn v. NBC, 234 F. Supp. 2d 1067, 1090 (C.D. Cal. 2002).  In contrast, the court cited to United States v. Mississippi, 380 U.S. 128 (1965) as a case in which there was the requisite allegation of a uniform policy maker:

the Supreme Court was faced with a complaint charging that the State of Mississippi and its election officials had, for 75 years, been writing and adopting constitutional provisions, statutes, rules, and regulations, and have been engaging in discriminatory practices, all designed to keep the number of white voters at the highest possible figure and the number of colored voters at the lowest. The defendants joined were state election commissioners and county voting registrars who, acting in concert, drafted and administered the various tests applied to voting applicants for registration to vote. The Court held that joinder of all defendants in one action was authorized by Rule 20(a), insofar as the complaint alleged facts showing that election officials acted and continued to act as part of a state-wide system designed to deprive colored people the right to vote solely because of their color....Mississippi involved a clear nexus between all of the discriminating individuals that justified joining all of the parties into a single case, namely, a state-wide discriminatory voting registration law that each county enforced as an instrumentality of the state. It is precisely this sort of uniform policy-maker - the State of Mississippi - that Plaintiffs are lacking in the present case.

1  Wynn v. NBC, 234 F. Supp. 2d 1067, 1079-80 (C.D. Cal. 2002).

2       Plaintiffs instead cite extensively to Mendoza v. Zirkle Fruit Co., 301 F.3d 1163 (9th Cir.

3  2002).  In Mendoza, plaintiffs were agricultural workers who sued their employers under the

4  Racketeer Influenced and Corrupt Organizations Act ("RICO") based on allegations that the

5  employers depressed overall worker wages by conspiring to hire illegal aliens at below market

6  wages.  While the district court found that the plaintiffs (who were not illegal aliens) did not have

7  standing to sue, the Ninth Circuit reversed, finding in key part that causation for their injury was

8  not too remote under a three part test that asked "(1) whether there are more direct victims of the

9  alleged wrongful conduct who can be counted on to vindicate the law as private attorneys

10  general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages

11  attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt

12  complicated rules apportioning damages to obviate the risk of multiple recoveries." Mendoza v.

13  Zirkle Fruit Co., 301 F.3d 1163, 1169 (9th Cir. 2002), citations omitted.  The most relevant

14  factor of the test (in relation to the case at hand) is the first.  The Ninth Circuit found that the

15  plaintiffs were the direct victims of the employers' conduct as "the illegal hiring scheme was

16  divined in order to depress the normal labor market....we are unable to discern a more direct

17  victim of the illegal conduct. The documented employees here do not complain of a passed-on

18  harm. They allege that the scheme had the purpose and direct result of depressing the wages paid

19  to them by the growers.." Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1170 (9th Cir. 2002).

20  Further, the other victims of defendants' conduct were illegal immigrants who could not be

21  counted on to appear in court and vindicate the law for fear of adverse immigration

22  consequences.

23       Plaintiffs claim that the holding in Mendoza is applicable in this case.  The main thrust of

24  Mendoza is standing and not joinder/severance.  Analyzing  the case under joinder/severance

25  demonstrates that the decision is consistent with the precedent of Winn.  The defendants in

26  Mendoza were two separate growing companies who together created another company which

27  "employs the [plaintiff] workers and then 'loans' them to the growers....as a 'front company' for

28  the purpose of perpetrating this scheme." Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1167 (9th

1    Cir. 2002).  The conspiracy between the two growers in creating the third company constitutes

2    the nexus or the uniform policymaker which justifies joinder (as well as standing under RICO).

3    In key part, the Ninth Circuit in Mendoza found that the plaintiffs"spell[ed] out a broad

4    conspiracy causing direct harm to the workers." Mendoza v. Zirkle Fruit Co., 301 F.3d 1163,

5    1171 (9th Cir. 2002).

6           Plaintiffs in this case make an argument that vaguely suggests some form of coordinated

7    action among Defendants to fix their actions regarding payment of agricultural workers but they

8    pointedly do not allege a conspiracy.  Plaintiffs have alleged "The practices of the industry are

9    uniform, or nearly uniform among many of the major grape growers, at least in part due to

10   grower organizations that spread improper employment practices." Doc. 65, Complaint, at 16:10-

11   12.  The language used by Plaintiffs is highly qualified and non-specific.  The reference to the

12   possibility that information was shared through certain unidentified grower organizations is

13   insufficient to allege that illegal practices were instituted by a uniform policy maker.  In

14   requesting supplemental briefing, the court invited Plaintiffs to describe how they might amend

15   the Complaint in light of the fact that severance might be granted.  Plaintiffs said that they "will

16   seek to make new claims in support of an argument in favor of joinder of all Defendants" but

17   then fail to allege a conspiracy. Doc. 127, Plaintiffs' Supplemental Brief, at 36:15-28.  The level

18   of coordinated action alleged by Plaintiffs is insufficient to warrant joining all Defendants in one

19   action.

20

21   **2. Expansive AWPA Standing**

22          Plaintiffs argue that AWPA (and related statutes like FLSA and FLCRA) must be read

23   expansively to permit each Plaintiff to sue each Defendant directly.  Plaintiffs cite to Juarez v.

24   Quintero, 530 F. Supp. 267, 270 (N.D. Cal. 1981), a case discussing the FLCRA, for the

25   proposition that "in order to meet standing requirements, plaintiffs need only show that they have

26   suffered actual injury as a result of the illegal conduct of the defendants. The issue to be decided

27   by this Court is not who possesses the legal rights protected by § 2045(b) and (c), but whether

28   plaintiffs suffered an actual injury as a result of conduct that violated someone's rights under

these sections." See Doc. 127, Plaintiffs' Supplemental Brief, at 39:2-4.  Under this reading of

the law, each Plaintiff has standing to bring AWPA claims against each Defendant due to the fact

that at least one Plaintiff's rights were violated by each Defendant.

        While the language of the decision is extremely expansive[2], the facts of the case are

limited.  The plaintiffs were striking farm workers who worked for defendant grower.  The strike

was not over the plaintiffs' working conditions but were in support of a strike by other workers

against nearby growers.  The defendant hired other farm workers without notifying them that

there was a strike taking place, an action in violation of 7 U.S.C. §2045.  The plaintiffs "allege

that the defendants' failure to inform the recruited workers of the existence of the strike caused

plaintiffs to be displaced from their jobs and to lose their ability to bargain effectively as

unionized employees." Juarez v. Quintero, 530 F. Supp. 267, 269 (N.D. Cal. 1981).  The Juarez

court found that the plaintiffs were harmed by the action and granted them standing to sue,

setting aside the question of whose rights under the FLCRA were violated.

        In terms of standing, Juarez is analogous to Mendoza without the issue of multiple

defendants.  Under AWPA, "Any person aggrieved by a violation of this Act or any regulation

under this Act by a farm labor contractor, agricultural employer, agricultural association, or other

person may file suit in any district court of the United States having jurisdiction of the parties..."

29 U.S.C. §1854(a).  In Mendoza, the Ninth Circuit noted that both RICO and federal antitrust

law granted standing to "any person" who was injured by actions that violated the respective

laws. Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1168 (9th Cir. 2002).  AWPA uses similar

language, and so the statutory grant of standing should follow the same guidelines.  Again, the

three part test for causation sufficient for RICO standing in the Ninth Circuit is: "(1) whether

there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate

_____

        [2]The court notes that Juarez has only been cited once by another court; the Seventh
Circuit referred to it for the proposition that "Courts have consistently certified class actions in
FLCRA cases, and there is no indication in any of these cases that Congress meant to prohibit
class actions under FLCRA." De La Fuente v. Stokely-Van Camp, Inc., 713 F.2d 225, 231 (7th
Cir. 1983).  The broad language proclaiming indifference to the identity of the violated rights'
owners in a standing analysis has not been cited.

1   the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the

2   plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will

3   have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries."

4   Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1169 (9th Cir. 2002), citations omitted.  In Juarez,

5   the court found the harm to be the fact that "plaintiffs were displaced from their jobs and that

6   they lost their former bargaining position." Juarez v. Quintero, 530 F. Supp. 267, 273 (N.D. Cal.

7   1981).  The defendants violated the law by failing to inform the newly hired farm workers that

8   there was a strike going on.  The newly hired workers were harmed in that they worked without

9   full knowledge of the employment conditions.  The striking farm workers (the plaintiffs in that

10  case) were also harmed, but in a distinct and independent manner.  Thus, the plaintiffs' injury

11  was direct and not derived from the injury of the newly hired workers.  Similarly, in Mendoza,

12  the illegal immigrant workers were injured by being paid less than the statutory minimum wage.

13  The legal workers (the plaintiffs in that case) were paid more than the minimum wage, but

14  claimed that their wages were depressed.  The harms to the two groups are legally distinct.

15      That does not hold true in the case at hand.  The Plaintiffs are alleging that the

16  Defendants acted in a uniform manner to violate their rights.  Under Plaintiffs' theory of the case,

17  the employees of each individual Defendant were thus subject to the same harm as the other farm

18  workers who were not employed by that particular Defendant.  Thus, the employees of each

19  individual Defendant are direct victims who can be counted on to vindicate the law.  If the court

20  were to follow Plaintiffs' theory of AWPA standing, then Plaintiffs could in fact sue all other

21  table grape growers in Kern County (or whatever the relevant farm worker employment market

22  is) without showing that any specific Plaintiff in fact was employed by these other growers.

23

24  **3. Joint Employment**

25      Plaintiffs also argue that Defendants are liable under a theory of "joint employment,"

26  borrowed from the FLSA. Doc. 127, Plaintiffs' Supplemental Brief, at 34:8-19.  The term

27  "employ" is to be given the same interpretation under AWPA as the FLSA. 29 U.S.C. §1802(5).

28  Under the FLSA, joint employment is defined as follows:

**12**

(a) A single individual may stand in the relation of an employee to two or more employers at the same time under the Fair Labor Standards Act of 1938, since there is nothing in the act which prevents an individual employed by one employer from also entering into an employment relationship with a different employer. A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case. If all the relevant facts establish that two or more employers are acting entirely independently of each other and are completely disassociated with respect to the employment of a particular employee, who during the same workweek performs work for more than one employer, each employer may disregard all work performed by the employee for the other employer (or employers) in determining his own responsibilities under the Act. On the other hand, if the facts establish that the employee is employed jointly by two or more employers, i.e., that employment by one employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the Act. In this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek. In discharging the joint obligation each employer may, of course, take credit toward minimum wage and overtime requirements for all payments made to the employee by the other joint employer or employers.

(b) Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or

(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

(3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 CFR §791.2. Joint employment describes a situation where a single employee works for more than one employer at the same time. The Ninth Circuit stated that "joint employment will generally be considered to exist when 1) the employers are not 'completely disassociated' with respect to the employment of the individuals and 2) where one employer is controlled by another or the employers are under common control." Chao v. A-One Med. Servs., 346 F.3d 908, 918 (9th Cir. 2003). A good example of this theory in practice comes from a recent Eastern District decision where joint employment was found in an AWPA case because defendants cooperated in managing and sharing profits from a number of orchards. Velasquez v. Khan, 2005 U.S. Dist. LEXIS 34681, *5-*6 (E.D. Cal. 2005). In contrast, Plaintiffs are essentially alleging that the fact

"Defendants have significant power to affect wages and working conditions throughout the labor market" is sufficient to render all Defendants as joint employers to all employees in the relevant farm labor market. Doc. 143, Plaintiffs' Supplemental Reply, at 31:19. The case law cited to the court does not support an expansion of joint employment theory in this novel direction.

**4. Efficient Case Management**

Plaintiffs also argue that case management would be more efficient if the case were preserved as a unified whole due to the desirability of simultaneously considering certain issues of pure law that are common to the claims against all Defendants. While the court certainly appreciates this consideration, Defendants are correct in asserting that efficiency must give way to the legal standards of joinder and misjoinder. Keeping all Defendants joined together in one suit is unnecessary for the vindication of Plaintiffs' rights. As a practical matter, the experience of this round of motions actually demonstrates the unwieldiness of having this many independent Defendants joined together. Plaintiffs themselves have had to submit tables to clarify exactly what issues each Defendant was raising or not raising. Some Defendants have also noted that they may be in "different procedural position[s] in light of related cases filed in different courts." Doc. 140, D.M. Camp Supplemental Reply, at 19:11. While the court makes no ruling on that issue, the possibility of preclusive effect from previous decisions in other cases against individual Defendants would indeed suggest that case management be best served by severance. At base, Plaintiffs admit that "the merits of the claims against each of the Defendants remains the proper focus of this action." Doc. 97, Plaintiffs' Opposition, at 13:9-17.

Plaintiffs also cite to In re Equity Funding Corp. Of America Securities, 416 F. Supp. 161 (C.D. Cal. 1976) for the proposition that pretrial consolidation is appropriate. That case does not deal with joinder and misjoinder (Fed. R. Civ. Proc. 19, 20, and 21) but rather with consolidation of multi-district litigation under Fed. R. Civ. Proc. 42(a). The court stated that "the effect of such pretrial consolidation is not and cannot be to 'merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another.'" In re Equity Funding Corp. of Am. Sec. Litig., 416 F. Supp. 161, 176 (C.D. Cal. 1976), quoting Johnson v.

Manhattan Railway, 289 U.S. 479, 496-97 (1933).  While the cases were consolidated for certain hearings, at base, they remained separate, independent actions.

**5. D.M. Camp's Request for Dismissal**

After severance, Defendant D.M. Camp argues that the case against it must be dismissed on a technicality. Doc. 68, D.M. Camp Brief, at 19:25-20:9.  D.M. Camp is the first named defendant and John Doe is the first named plaintiff.  John Doe was an employee of Sunview and Marko Zaninovich, not D.M. Camp.  D.M. Camp points to language in Wynn for the proposition that the first plaintiff must be matched with the first defendant in a case: "In fact, Plaintiff Tracy Keenan Wynn, the first named Plaintiff, has not even specifically alleged to have applied, or been deterred from applying, to work for Defendant NBC, the first named Defendant. Such deficiencies in the pleadings will not allow this action to proceed based on the complaint in its present form." Wynn v. NBC, 234 F. Supp. 2d 1067, 1091 n.13 (C.D. Cal. 2002).  The court is not convinced that Wynn meant to require such a strict plaintiff-defendant match.  Wynn was using the lack of connection between the first plaintiff and the first defendant as an illustration of how deficient the pleadings are as "not one Plaintiff has alleged that he or she applied for a specific writing position available with a specific Defendant." Wynn v. NBC, 234 F. Supp. 2d 1067, 1074 (C.D. Cal. 2002).  Dismissal of a severed action against D.M. Camp is not warranted on this ground.

**C. AWPA**

Plaintiffs' first claim arises out of alleged violations of AWPA:

a. failing to disclose in writing the terms and conditions of employment at the time Plaintiffs were recruited, in violation of 29 U.S.C. §1821(a); b. providing false and misleading information regarding the terms and conditions of employment of Plaintiffs, in violation of 28 U.S.C. §1821(f); c. violating the terms of the working arrangement made with Plaintiffs in California, in violation of 28 U.S.C. §1822(c); and/or by d. failing to pay wages when due in violation of 29 U.S.C. §1822(a).

Doc. 65, Complaint, at 29:11-17.  Under AWPA, "Any person aggrieved by a violation of this Act or any regulation under this Act by a farm labor contractor, agricultural employer,

1   agricultural association, or other person may file suit in any district court of the United States

2   having jurisdiction of the parties..." 29 U.S.C. §1854(a).  Plaintiffs argue that they may sue for

3   recovery of state law violations through AWPA since the legislation has effectively incorporated

4   those causes of action.  Several Defendants seek to have Plaintiff's AWPA claims dismissed for

5   failure to state a claim.  The arguments concerning AWPA are varied.

6        AWPA includes several provisions detailing how an employer must treat an employee.  In

7   relevant part, AWPA mandates that "Each farm labor contractor, agricultural employer, and

8   agricultural association which employs any [migrant or seasonal] agricultural worker shall pay

9   the wages owed to such worker when due.....No farm labor contractor, agricultural employer, or

10  agricultural association shall, without justification, violate the terms of any working arrangement

11  made by that contractor, employer, or association with any [migrant or seasonal] agricultural

12  worker." 29 U.S.C. §1822; 29 U.S.C. §1832.  The law leaves the terms "wages" and "working

13  arrangement" ambiguous.  It is well accepted that AWPA is remedial in nature and must be

14  construed broadly to effect its humanitarian purpose. Barajas v. Bermudez, 43 F.3d 1251, 1260

15  (9th Cir. 1994); Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1505 (11th Cir. 1993);

16  Bracamontes v. Weyerhaeuser Co., 840 F.2d 271, 276 (5th Cir. 1988).  To determine what

17  constitutes the core federal case, the court must decide to what extent these terms allow Plaintiffs

18  to sue under AWPA for violations of California regulations.

19

20  **1. Migrant vs. Seasonal Workers**

21        AWPA sets out regulations for the employment of agricultural workers on a seasonal or

22  temporary basis.  Title 29 U.S.C. §1854 provides a federal private right of action for individuals

23  who suffer from noncompliance with those regulations.  Under AWPA, temporary agricultural

24  workers are divided into two categories: migrant (required to be absent overnight from residence

25  while working) and seasonal (not required to be absent overnight from residence while working.

26  29 U.S.C. §1802(8) and (10).  Sections 1821 and 1822 regulate certain conditions of migrant

27  agricultural workers while Sections 1831 and 1832 are parallel regulations for seasonal

28  agricultural workers.  Plaintiffs allege violations of Section 1821 and 1822. Doc. 65, Complaint

16

1   at 29:11-17.  However, it appears that Plaintiffs are seasonal workers as opposed to migrant

2   workers since they are all residents of Kern County.  Defendants seek to have the these claims

3   dismissed on the basis that Plaintiffs' factual allegations demonstrate they can not obtain relief

4   under the cited AWPA provisions.

5        Plaintiffs' admit that "if they were writing the complaint now, they would have made

6   express in Paragraphs 61-63 citations to both 29 U.S.C. §§1821 & 1822 (dealing with migrant

7   workers) and 29 U.S.C. §§1831 & 1832 (dealing with seasonal workers) or simply strike

8   references to any particular statutory sections." Doc. 97, Opposition, at 15:10-14.  However, they

9   allege that their pleading gave Defendants sufficient notice of the nature of the claims.  In the

10  alternative, Plaintiffs seek to amend their pleading. Doc. 97, Opposition, at 18:25-26.

11       An amended pleading would be the best option under the circumstances.  Plaintiffs have

12  indicated that they wish to sue under both migrant and seasonal worker provisions.  Under

13  AWPA, seasonal and migrant workers are mutually exclusive designations.  The substantive

14  AWPA laws regulating their employment, while similar do differ slightly.  Section 1821(a)

15  requires certain information to be provided in writing at the time of recruitment while Section

16  1831(a) only requires that the information be provided in writing upon request.  A Plaintiff who

17  is a migrant worker may not be the class representative of seasonal workers and vice versa.

18  Plaintiffs must amend the Complaint to clarify the factual and legal basis of their AWPA claims.

19       Defendants Stevco, FAL, Castle Rock, and El Rancho also seek dismissal of the AWPA

20  claims on the basis the Complaint provides insufficient detail to state a claim. See Doc. 74,

21  Stevco Brief, at 36:7-37:11; Doc. 78, Castle Rock Brief, at 16:10-18:17; Doc. 81, El Rancho

22  Brief, at 9:6-11:8.  As Plaintiffs are directed to amend their pleadings and provide more facts

23  with respect to the AWPA claims, the court will not address Defendants' arguments at this time.

24  Plaintiffs are given leave to address these perceived shortcomings in their amended complaint.

25

26  **2. Wages**

27       The case most on point in determining the definition of "wages" comes from the Northern

28  District: Medrano v. D'Arrigo Bros. Co., 125 F. Supp. 2d 1163 (N.D. Cal. 2000).  In Medrano,

17

1  the plaintiffs sought relief under both AWPA and a number of state statutes.  The plaintiffs

2  alleged that defendant forced them to ride a specific bus to and from the work site, forbidding

3  them from driving directly there.  Under California law, workers must be compensated for such

4  compulsory travel time. Morillion v. Royal Packing Co., 22 Cal. 4th 575, 587 (Cal. 2000)

5  (decision already handed down by time Medrano was decided).  The plaintiffs argued the failure

6  to pay workers for that travel time in accordance with state law was a violation of AWPA.  The

7  defendants, in their motion to dismiss, forwarded a narrower interpretation of AWPA, implicitly

8  "add[ing] limiting words to Section 1832(a), reading it to say that payment of wages is required

9  only when wages are due according to federal wage and hour laws." Medrano v. D'Arrigo Bros.

10  Co., 125 F. Supp. 2d 1163, 1166 (N.D. Cal. 2000).  Framing the analysis, the court stated:

11  "AWPA does not define or otherwise explain which substantive rights define the 'wages owed'

12  under Section 1832(a). That is, the Act does not address whether an employer's violation of

13  provisions of state law or the parties' agreement is equivalent to a failure to pay wages. There are

14  no reported cases which have addressed this precise issue. This Court thus must decide as a

15  matter of first impression whether [defendant] may be held liable under AWPA for violations of

16  state wage and hour laws." Medrano v. D'Arrigo Bros. Co., 125 F. Supp. 2d 1163, 1166 (N.D.

17  Cal. 2000).

18       Ultimately, the court found in favor of the plaintiffs, reasoning that "Section 1832(a) does

19  not make specific reference to federal or state law, and the Act certainly does not indicate that an

20  employer's obligation to pay may arise only from the AWPA itself. Moreover, while there are no

21  reported cases which have addressed explicitly whether Section 1832(a) incorporates state law, a

22  number of courts have suggested implicitly that it does." Medrano v. D'Arrigo Bros. Co., 125 F.

23  Supp. 2d 1163, 1167 (N.D. Cal. 2000), citing Antunez v. G & C Farms, Inc., CIV-92-0308 HB,

24  1993 U.S. Dist. LEXIS 21353, at *31-32 (D.N.M., Aug. 9, 1993) ("New Mexico law requires

25  employers to contribute to an unemployment insurance fund. The failure of an employer to make

26  these payments, when required, constitutes a violation of AWPA's requirement that wages be

27  paid when due"); Fields v. Luther, Civil No. JH-84-1875, 1988 U.S. Dist. LEXIS 5405, at *48-49

28  (D. Md., May 4, 1988) ("Federal and Maryland law require employers to contribute to an

1  unemployment insurance fund. The failure of an employer to make these payments, when

2  required, constitutes a violation of the AWPA's requirement  that wages be paid when due").

3  The court specifically rejected the argument "that because there is an explicit reference to federal

4  and state laws in the housing and transportation sections of AWPA, (see, e.g. 29 U.S.C. §1823),

5  the absence of such a reference in Section 1932(a) must mean that Congress did not intend to

6  incorporate state law into Section 1832(a)....Under such reasoning Section 1832(a) could not

7  incorporate *any* substantive law outside the Act itself. However, as [defendant] acknowledges,

8  Section 1832(a) does incorporate other federal laws." <u>Medrano v. D'Arrigo Bros. Co.</u>, 125 F.

9  Supp. 2d 1163, 1167-8 (N.D. Cal. 2000).

10      While the court has not found any case law that directly states Sections 1822(a) and

11  1832(a) require employers to pay workers wages prescribed by state regulation, the logic of

12  existing case law compels that result.  A recent bench trial in the Eastern District of California

13  found Section 1822(a) violations which implied, but did not specify that it was partially based on

14  failure to pay the state minimum wage; the findings of fact stated "Aside from one initial

15  payment, Plaintiffs were not paid for the farm labor services they performed....[defendant] failed

16  to remit required deductions and employer contributions for unemployment insurance, disability,

17  social security, and federal unemployment insurance....Unpaid wages owed to Plaintiffs,

18  calculated with reference to the $ 5.75 per hour California minimum wage." <u>Velasquez v. Khan</u>,

19  2005 U.S. Dist. LEXIS 34681, *4-6 (ED. Cal. 2005).

20      Wages may be defined by federal, state, and local laws.  Failure by an employer to pay

21  those wages constitute violations of AWPA.  Thus the actions alleged in the Complaint (forcing

22  workers to work without pay) are sufficient to state a claim for violation of AWPA for failing to

23  pay wages when due.

24

25  **3. Working Arrangements**

26      Defining "working arrangement" is much less clear cut.  "No farm labor contractor,

27  agricultural employer, or agricultural association shall, without justification, violate the terms of

28  any working arrangement made by that contractor, employer, or association with any [migrant or

1   seasonal] agricultural worker." 29 U.S.C. §1822(c); 29 U.S.C. §1832(c).  Plaintiffs state "the

2   phrase 'working arrangement' was intended by Congress and has subsequently been interpreted

3   to cover any state or federal laws impacting the terms and conditions of employment, as well as

4   any written, oral or understood terms of that employment....Plaintiffs therefore suggest that *any*

5   state law cause of action that relates to the obligations that an employer has to a migrant or

6   seasonal farmworker, relating to working conditions (including wages, overtime, reimbursement

7   of expenses, breaks, timing of the payment of wages, wage statements and other work related

8   items), clearly serves as a predicate violation of the AWPA 'working arrangement' for these

9   workers." Doc. 127, Plaintiffs' Supplemental Brief, at 10:5-11:13.  That is, Plaintiffs claim

10  working arrangements are all employment conditions communicated by the employer to the

11  employee as well as all statutes governing employment conditions.

12      The Defendants appear to agree that all employment conditions communicated by the

13  employer to the employee qualify as working arrangements. See Doc. 128, D.M. Camp

14  Supplemental Brief, at 4:11-13; Castle Rock Supplemental Brief, at 4:7-12.  AWPA states, "No

15  farm labor contractor, agricultural employer, or agricultural association shall, without

16  justification, violate the terms of any working arrangement made by that contractor, employer, or

17  association with any [migrant or seasonal] agricultural worker." 29 U.S.C. §1822(c); 29 U.S.C.

18  §1832(c).  The Southern District of Texas has said, "The working arrangement, then, is the

19  understandings of the parties, given their mutual knowledge and conduct, as to the expected

20  terms and conditions of employment." Aviles v. Kunkle, 765 F. Supp. 358, 366 (S.D. Tex. 1991),

21  vacated on other grounds.

22      The parties dispute whether 'working arrangement' encompasses the full range of statutes

23  and regulations that govern employment conditions when those rules have not been

24  communicated from the employers to the employees.  A law review article has surveyed the case

25  law and concluded that "Most courts that have squarely considered the question of whether the

26  working arrangement provisions can be construed to encompass substantive requirements

27  imposed on employers by separate statutory schemes have answered the question affirmatively.

28  In fact, some courts seem to accept this as such a well-settled point of law that, in holding that

1    employers have violated a working arrangement by engaging in acts that violate other statutory

2    schemes, they engage in no discussion about what actually constitutes a working arrangement

3    under §1822(c) or §1832(c)." Laura Lockhard, *Towards Safer Fields: Using AWPA's Working*

4    *Arrangement Provisions to Enforce Health And Safety Regulations Designed to Protect*

5    *Farmworkers*, 28 N.Y.U. Rev. L. & Soc. Change 507, 528 (2004).  While the court agrees that

6    several cases that found AWPA working arrangement violations have not actually discussed what

7    constitutes a working arrangement, the court does not find the question nearly as clear cut.  One

8    Ninth Circuit opinion discussing the appropriate statute of limitations for AWPA claims said,

9    "AWPA encompasses requirements relating to information and recordkeeping, worker health and

10   safety, as well as enforcement of contractual working arrangements." Barajas v. Bermudez, 43

11   F.3d 1251, 1257 (9th Cir. 1994).  While not pointing to Sections 1822(c) and 1832(c)

12   specifically, the language implies that working arrangements should be understood as the

13   contract terms between the employer and employee.  Another court has even said that an AWPA

14   working arrangment must be in writing and that oral agreements do not qualify. De

15   Leon-Granados v. Eller & Sons Trees, Inc., 452 F. Supp. 2d 1282, 1284 (N.D. Ga. 2006).

16   However, that seems to be a minority view that has not been adopted by other courts.

17          Two district court cases have directly addressed the issue at hand and have come to

18   opposite conclusions.  The Eastern District of Michigan stated, "the term 'working arrangement'

19   includes those aspects of the working relationship that are required by law." Elizondo v.

20   Podgorniak, 100 F. Supp. 2d 459, 463 (E.D. Mich. 2000).  Relying directly on Elizondo, the

21   Northern District of New York has said "For purposes of the pending motion for summary

22   judgment, the Court will assume that federal and state employment related laws are part of the

23   working arrangement between Plaintiffs and Defendants." De La Cruz v. Gill Corn Farms, Inc.,

24   2005 U.S. Dist. LEXIS 44676, *22-23 (N.D.N.Y. 2005).  The Northern District of Ohio, on the

25   other hand, described AWPA in general as "primarily intended to regulate the contractual

26   relationship that exists between farmers, labor contractors and migrant workers. In essence, the

27   AWPA sets out certain provisions that are included, by force of law, in the migrant worker's

28   employment contract." Sanchez v. Overmeyer, 845 F. Supp. 1178, 1179 (N.D. Ohio 1993).

However, the court then limited the scope what terms must be included in the statutory employment contract: "In its prior ruling, the Court concluded that the term 'wage' contained in Section 1822(b) [sic] included, by implication, the employer's share of a migrant worker's PICA [sic] tax. Plaintiffs have not provided compelling authority for their contention that a 'working arrangement made' by an employer, as that phrase is used in Section 1822(c), includes the payment of PICA [sic] taxes. This Court is inclined to read Section 1822(c) as relating to express terms of a working arrangement as opposed to those implied by law." Sanchez v. Overmyer, 845 F. Supp. 1183, 1187 n.3 (N.D. Ohio 1993).  Thus, while willing to read the term "wage" to include statutory requirements, the court was unwilling to read "working arrangement" as broadly.

The language contained in other cases related to this issue are ambiguous.  The Middle District of Florida found that, "The defendants created a 'working arrangement' within the meaning of 29 U.S.C. 1822(c) and 1832(c) by posting an official Department of Labor poster that notified workers of their right to receive at least $ 4.25 for each hour worked in the workweek, and then, as they concede, violated that working arrangement without justification on at least some occasions by failing to pay the minimum wage." Wales v. Jack M. Berry, Inc., 192 F. Supp. 2d 1269, 1287 (M.D. Fla. 1999).  The language appears to presuppose that a working arrangement was not created until the employer communicated to the employee the wage rate even though that rate was mandated by minimum wage laws.  Wales suggests that "working arrangement" does not automatically encompass the full spectrum of employment regulations but only those that are actually communicated between employer and employee.

In another case, such a communication between the parties was inferred though there was no direct evidence to that effect.  The magistrate judge who conducted the bench trial factually determined that "[the defendant] did not describe to employees in any detail company policies relating to absenteeism, work beyond the normal 8-hour day and weekend work. It was the defendant's policy, however, not to *require* employees to work on weekends, although they might be requested to do so voluntarily....In fact, the plaintiffs understood that, while they might be required to work beyond the 8-hour period during the week, weekend work was voluntary."

1    Colon v. Casco, Inc., 716 F. Supp. 688, 690 (D. Mass. 1989).  Based on these facts, the District

2    of Massachusetts found: "Appellant does not contest the existence of its 'policy' of voluntary or

3    optional weekend work or the general knowledge of this policy among the workers, including

4    plaintiffs. Instead, it contends that this weekend work policy was never explicitly made a part of

5    the 'working arrangement.' It may be true that there was no written agreement handed over to the

6    workers including this provision. However, given the undisputed mutual knowledge of and

7    reliance upon this policy, it would not be fair or proper in consideration of the goal of protecting

8    seasonal agricultural workers to exclude this understanding from the 'working arrangement.'"

9    Colon v. Casco, Inc., 716 F. Supp. 688, 693-94 (D. Mass. 1989).  Though there may not have

10   been evidence that detailed the precise instance of communication, it appears that the courts

11   inferred that the content of the weekend work policy were transmitted from the employer to the

12   employee, creating a working arrangement.

13        The Fourth Circuit has also issued an opinion which touches on the subject.  The H-2 visa

14   program allows employers to apply to the Department of Labor to hire foreign workers when they

15   demonstrate a labor shortage.  The regulations state that "As part of the temporary labor

16   certification application, the employer shall include assurances, signed by the employer,

17   that....the employer will comply with applicable Federal, State and local employment-related

18   laws, including employment related health and safety laws." 20 C.F.R. § 655.203.  In the case,

19   the employers received federal approval and hired agricultural workers, paying them between

20   $4.49 and $4.70 per hour; the agricultural workers then sued, claiming that the complex federal

21   regulations governing the H-2 visa program mandated a wage of at least $6.00 per hour.

22   Donaldson v. United States Dep't of Labor, 930 F.2d 339, 342 (4th Cir. 1991).  The Fourth

23   Circuit found that, "The amended complaint also sought to allege violations of §§ 1822(c) and

24   1832(c), which require that agricultural employers such as defendants here not 'violate the terms

25   of any working arrangement ...with [migrant and seasonal farmworkers].' The theory of this

26   proposed allegation was that the 'working arrangement' between workers and growers here is the

27   'job offer' made in the clearance process by which, per 20 C.F.R. § 655.203(b), each grower

28   defendant promised to comply with all federal employment related laws, which included, inter

alia, the violated DOL regulation governing piece-rate wages payable under the H-2 program."

Donaldson v. United States Dep't of Labor, 930 F.2d 339, 350 (4th Cir. 1991).  However, the

federal regulations appear to state that the promise to comply with federal employment laws are

not given to the employees but rather to the government agencies that review the applications.

Another case (not dealing with AWPA) states, "The terms of a job clearance order which reflect

DOL requirements become a part of the employment contract as a matter of law. An employer is

expressly obligated to make those terms clear to his employees.  The fact that the Growers may

have failed to do so, or that for whatever reason the Farmworkers may never have been aware of

the job clearance order amendment, in no way minimizes the Growers' contractual obligation in

this context." Frederick County Fruit Growers Ass'n v. McLaughlin, 703 F. Supp. 1021, 1031

(D.D.C. 1989), citing Salazar-Calderon v. Presidio Valley Farmers Ass'n, 765 F.2d 1334, 1342

(5th Cir. 1985).  The District of Maryland outlined the practical relationship between AWPA and

these regulations: "The criteria job orders submitted by defendant in its effort to procure H-2

workers constituted the working arrangements against which both domestic and H-2 employees

were recruited. By its own terms, these job orders claimed to be complete documents listing all

material terms involved. The reason for the DOL requirement for such assurances is clear:

workers respond to the circulated announcements by travelling to the worksite at their own

expense and, in keeping with the humanitarian purpose of AWPA, must be protected from unfair

surprises upon arrival." Bernett v. Hepburn Orchards, Inc., 1987 U.S. Dist. LEXIS 16873, *19-20

(D. Md. 1987).  The factual background of the Fourth Circuit case is not altogether clear as to

whether a copy of the job clearance order was provided to the workers as required.  Other courts

have also read the terms of employer initiated visa applications, specifically the promise to

comply with employment laws, as comprising part of an AWPA working arrangement. See

Perez-Farias v. Global Horizons, Inc., 2007 U.S. Dist. LEXIS 50403, *21-25 (E.D. Wash. 2007);

Villalobos v. N.C. Growers' Ass'n, 2001 U.S. Dist. LEXIS 25266, *10-14 (D.P.R. 2001)

(magistrate judge's findings and recommendations); Alfred v. Okeelanta Corp., 1990 U.S. Dist.

LEXIS 21021, *17-18 (S.D. Fla. 1990); Salazar-Calderon v. Presidio Valley Farmers Ass'n, 765

F.2d 1334, 1340-3 (5th Cir. 1985) (dealing with AWPA's predecessor law, the Farm Labor

Contractor Registration Act which also included "working arrangement" language).  These cases may be cited for the proposition that all employment related laws are automatically incorporated into an AWPA working arrangement, but it is possible to read them more narrowly.

Legislative history offers some limited insight.  The House Committee on Education and Labor issued a report on AWPA which stated, ""Subsection 202(c) provides that a farm labor contractor, agricultural association or agricultural employer shall not, without justification, violate the terms of any working arrangement made by that entity with any migrant agricultural worker. It is the Committee's intention that the duty is owed by the entity that makes the arrangement with the migrant worker and any additional entity which is a joint employer with such entity." H.R. Rep. No. 97-885, at 17 (1982), reprinted in 1982 U.S.C.C.A.N. 4547.  The Senate Committee on Labor and Public Welfare issued a report on the FLCRA which stated, "A certificate of registration may be refused, revoked, or suspended if the farm labor contractor has committed certain specified violations such as...unjustifiably failing to perform working arrangements entered into with farm operators or with migrant workers." S. Rep. No. 88-202, at 2, reprinted in 1964 U.S.C.C.A.N. 3690.[3]  The Department of Labor regulations implementing AWPA state: "The Act prohibits farm labor contractors, agricultural employers and agricultural associations from violating, without justification, the terms of any working arrangements they have made with migrant or seasonal agricultural workers." 29 C.F.R. §500.72.  All of these sources essentially echo the language of the statute itself.  Nevertheless, they do emphasize the fact that the substantive terms of working arrangements are made by employers (and other covered entities) with employees.  That is, working arrangements are created in the interaction between those parties.

Given the background, this court finds that a working arrangement under AWPA

---

[3]The text of the FLCRA states "the Secretary may refuse to issue, and may suspend, revoke or refuse to renew a certificate of registration to any farm labor contractor if he finds that such...(3) has failed, without justification, to perform agreements entered into or arrangements with farm operators; (4) has failed, without justification, to comply with the terms of any working arrangements he has made with migrant workers." Farm Labor Contractor Registration Act of 1963, Pub. L. No. 88-582, 78 Stat. 920.

constitutes the terms of employment actually communicated between employer and employee.  It

does not automatically encompass any and all statutes and regulations governing agricultural

employment.  On the other hand, the communication need not necessarily be verbal or in writing.

As the District of Massachusetts has found, an accepted custom or practice that the employer

enforces and the employee follows can also qualify as an implicitly communicated term. See

Colon v. Casco, Inc., 716 F. Supp. 688, 690 (D. Mass. 1989).


**4. Duplicate Recovery**

In a case cited by Plaintiffs, the U.S. Supreme Court has said that "AWPA pre-empts

state law to the limited extent that it does not permit States to supplant, rather than to

supplement, AWPA's remedial scheme." Adams Fruit Co. v. Barrett, 494 U.S. 638, 649 (1990).

AWPA provides for an "award [of] damages up to and including an amount equal to the amount

of actual damages, or statutory damages of up to $500 per plaintiff per violation, or other

equitable relief except that (A) multiple infractions of a single provision of this Act or of

regulations under this Act shall constitute only one violation for purposes of determining the

amount of statutory damages due a plaintiff; and (b) if such complaint is certified as a class

action, the court shall award no more than the lesser of up to $500 per plaintiff per violation, or

up to $500,000 or other equitable relief." 29 U.S.C. §1854(c)(1).

Plaintiffs have clarified that they are "seeking recovery under both AWPA for statutory

damage and their state law claims for actual damages and that this would not constitute double

recovery. In other words, while the AWPA statutory award was intended to compensate the

Plaintiffs for not receiving timely payment ('failure to pay wages when due') and to deter the

Defendants from withholding timely payment in the future, an award of all unpaid wages and

penalties would compensate Plaintiffs for the Defendants' failure to pay wages they were

obligated to pay under California wage and hour law and under contract." Doc. 127, Plaintiffs'

Supplemental Reply, at 10:13-19.  The Ninth Circuit has said AWPA's language  "does not

expressly or implicitly exclude an award of statutory damages for violation of any provision of

[AWPA] plus actual damages for violation of state law. We need not decide whether a court may

1  award statutory damages when actual damages are awarded under state law for the same harm

2  because, as the district court made clear, the amounts it awarded do not compensate for the same

3  harm. While the statutory damage award was intended to compensate the plaintiffs for not

4  receiving timely payment and to deter the defendants from withholding timely payment in the

5  future, the backpay award compensated plaintiffs for the [defendants'] failure to pay the wages

6  they were obligated to pay under the contract." Martinez v. Shinn, 992 F.2d 997, 1001 (9th Cir.

7  1993), citing Frederick County Fruit Growers Ass'n v. Dole, 709 F. Supp. 242, 248 (D.D.C.

8  1989) (declining to award statutory damages under AWPA in addition to actual damages under

9  contract theory for back wages though the court notes it has the power to do so).

10       Although other courts have stated that the statutory damages are punitive in nature, the

11 Ninth Circuit has specifically declined to make that finding. Six Mexican Workers v. Arizona

12 Citrus Growers, 904 F.2d 1301, 1309 (9th Cir. 1990), citing Alvarez v. Longboy, 697 F.2d 1333,

13 1340 (9th Cir. 1983). Martinez instead characterizes those damages as playing a deterrent value.

14 At least one other court has relied on Martinez to allow recovery of both compensatory and

15 statutory damages. See Herrera v. Singh, 103 F. Supp. 2d 1244, 1250 (E.D. Wash. 2000) ("the

16 AWPA does not expressly or implicitly exclude an award of statutory damages in addition to an

17 award for actual damages for violation of state law....In the instant case, Plaintiffs were

18 compensated for wrongful discharge stemming from the same set of facts. They have been

19 compensated for their losses due to Defendant's wrongful action, but the recovery of lost wages

20 addresses a different purpose than the AWPA. [A statutory] award of $ 200 per Plaintiff is

21 appropriate when balancing these considerations").

22       On a related note, there is the potential for duplicate recovery within AWPA itself.  Given

23 the legislative history, Section 1822(c) must be read as a catch all provision.  Thus, "working

24 arrangement" can refer to the terms of employment as well as regulatory requirements that

25 govern employment conditions, be they federal, state, or otherwise.  As a broad catch all, Section

26 1822(c) arguably covers some actions addressed by other provisions of AWPA that list specific

27 violations.  Absent any principled means of drawing lines between the Section 1822(c) and other

28 provisions (or clearer direction from Congress), the court accepts the possibility that some

1    overlap exists.  In several cases, the failure to pay wages has been termed a violation of Section

2    1822(c) in addition to Section 1822(a). See <u>Wales v. Jack M. Berry, Inc.</u>, 192 F. Supp. 2d 1269,

3    1287 (M.D. Fla. 1999); <u>Cruz v. Vel-A-Da, Inc.</u>, 127 Lab. Cas. (CCH) P33,074 (N.D. Ohio 1993);

4    <u>Donaldson v. United States Dep't of Labor</u>, 930 F.2d 339, 349 (4th Cir. 1991) (dealing with

5    Section 1832(a) and (c) as well).  That is not to say that the two provisions are redundant; Section

6    1822(a) appears to cover those elements of wages like unemployment insurance and FICA tax

7    which are mandated by law even when they are not necessarily part of the mutual understanding

8    that constitutes the working arrangement.  Since statutory damages are calculated per provision,

9    this opens the possibility that one action could allow for double recovery.  This potential problem

10   is avoided as Section 1854(c) makes clear that damages under AWPA are subject to the

11   discretion of the trial judge.

12        Plaintiffs' request for both actual damages under state law and statutory damages under

13   AWPA is generally permissible.  Where state law provides for statutory damages, the trial court's

14   discretion may be called upon to prevent double recovery.  Plaintiffs causes of action under

15   multiple, duplicative AWPA provisions is also permissible.  The court does warn the parties that

16   these issues may be revisited in the future if the need arises.

17

18   **D. State Law Claims**

19        The court can not make a determination regarding the state claims until there is a firm

20   delineation between those state claims which also form the basis for AWPA claims and those for

21   which no AWPA relief is sought.  The state law issues are complex and several are arguably of

22   first impression; making rulings defining the bounds of state law claims is not a task to be done

23   lightly.  Should Plaintiffs' state law claims not implicate AWPA, the court must then undergo a

24   full analysis to determine whether supplemental jurisdiction should be exercised.  As the

25   Complaint does not contain allegations as to what was communicated between the parties

26   concerning working conditions, Plaintiffs are granted leave to amend to make appropriate factual

27   allegations to support their claims.

28

**IV. Order**

Defendants' motions to sever are GRANTED.

Defendants' motion to dismiss the complaint is GRANTED WITHOUT PREJUDICE. This order makes no substantive ruling regarding the merits of any of Plaintiffs' claims. Plaintiffs are directed to file amended complaints in conformance with this order within sixty (60) days of the filing of this order.  Should Plaintiffs choose to continue pleading pseudonymously, Plaintiffs must simultaneously file motions for leave to proceed as Does.

IT IS SO ORDERED.

Dated:    **March 31, 2008**                                **/s/ Anthony W. Ishii**
                                                                    UNITED STATES DISTRICT JUDGE